IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ANTHONY ALVAREZ,
and STEVEN JOHN ROBBINS, on behalf
of themselves and others similarly situated,

    *Plaintiffs,*

VS.

ELON REEVE MUSK, AMERICA PAC,
CHRIS GOBER, and CHRIS YOUNG,

    *Defendants*.

No. 1:24-cv-01174-RJJ-MV

HON. ROBERT J. JONKER

MAG. MAARTEN VERMAAT

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

**-- ORAL ARGUMENT REQUESTED --**

Defendants respectfully submit this reply in support of their Motion to Dismiss (ECF No. 18) and Brief in Support (ECF No. 19, "MTD Brief"). Plaintiffs' Response (ECF No. 20, "Response" or "Resp.") does not cure Plaintiffs' failure to: (1) allege facts demonstrating this Court's jurisdiction; and (2) state a claim for relief. For the reasons in the MTD Brief and those here, this Court should dismiss Plaintiffs' First Amended Complaint (ECF No. 7, "Am. Compl.") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

**I.    The Response cannot cure Plaintiffs' failure to allege Article III injury.**

Because Plaintiffs have not alleged injury within the meaning of Article III of the United States Constitution, this Court lacks subject matter jurisdiction. MTD Brief at PageID.85-91. Plaintiffs argue otherwise on the theory that "Defendant's [*sic*] fraudulent inducement of Plaintiffs' private information in connection with their signature on a public petition constitutes actual and concrete privacy harm." Resp. at PageID.163. It is unclear whether Plaintiffs consider

1

"privacy injury" and "fraudulent inducement" to be independent theories of Article III injury. Defendants address each one.

To the extent Plaintiffs' standing theory is premised upon alleged "fraudulent inducement," it fails because it is legally conclusory. As explained *infra*, III(a), Plaintiffs have not stated a fraudulent inducement claim under Michigan law. And "it is a 'long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'" *Bearden v. Ballad Health*, 967 F.3d 513, 518 (6th Cir. 2020) (quotation omitted); *see also Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 351 (6th Cir. 2024) ("we need not accept the complaint's legal conclusions as true."). A naked assertion of fraudulent inducement does not state Article III injury. Moreover, the Original Complaint asserted fraudulent inducement, but the amended complaint drops this theory, *see infra*, III(a). Plaintiffs cannot rely on this theory to avoid dismissal.

Plaintiffs further argue that they alleged "a privacy injury" via "disclosure of private information," citing *TransUnion LLC v. Ramirez*, 94 U.S. 413, 423, 425 (2021). Resp. at PageID.161. Plaintiffs' attempt to support this "privacy injury" theory with factual allegations that do not appear in their live pleading, and by citing distinguishable, non-controlling cases. None of these efforts supports Plaintiffs' theory of Article III injury. Six points merit the Court's attention.

**First**, as detailed in the MTD Brief (at PageID.85-89), *TransUnion*'s facts are wholly distinct from those alleged here. *TransUnion* involved unverified (and likely false) information about plaintiffs' purported criminal activity, which TransUnion provided in response to consumer credit inquiries. *TransUnion*, 94 U.S. at 442. The Supreme Court found that the plaintiffs about whom such information was *actually disclosed* had standing to sue TransUnion because they had "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation."

*Id.* at 432. But the Court also concluded that plaintiffs "whose [likely false and defamatory] credit reports were *not* provided to third-party businesses did not suffer a concrete harm and thus do not have standing." *Id.* at 442 (emphasis added).

Plaintiffs attempt to distort *TransUnion* to support the proposition that *their own disclosure* of basic contact information to America PAC caused them Article III injury. This fails, because *TransUnion* never held this. In fact, *TransUnion* undermines Plaintiffs' argument, because they allege no specific disclosure of their information to any third party—let alone a false or defamatory one. In short, Defendants found no case (and Plaintiffs cite none) where a plaintiff's disclosure of their own non-confidential information (*i.e.*, not a social security number or other highly sensitive information) states Article III injury.[1]

**Second**—perhaps realizing this—the Response (at PageID.163) attempts to add new factual allegations to the Amended Complaint, stating that Defendants "monetized and publicized" Plaintiffs' names and contact information. This lacks support in the Amended Complaint. Tellingly, when alleging "monetization" and "publication," the Response (at PageID.162) cites Amended Complaint ¶ 71. Paragraph 71, in turn, claims that "signatures on the petition were used to inflate the numerical support for Musk and [*sic*] PAC's political views, support for the Republican candidate for President and other conservative themes and views." Am. Compl. ¶ 71 (PageID.43). If true, this would not amount to "monetization" or "publication" of Plaintiffs'

---

[1] To the extent the Response (at PageID.162) implies that Plaintiffs' names, mailing addresses, emails, and phone numbers were disclosed to the general public because they signed a "public petition," the Amended Complaint does not allege this (and there is no factual support for such allegation). Rather, Plaintiffs allege that America PAC's petition signature *page* was publicly available online. They do not claim that *Plaintiffs' specific contact information* was disclosed publicly (it was not). *See* Am. Compl.

information. And as the MTD Brief (at PageID.91, n. 12) explains, these allegations do not support any other theory of Article III injury, either.

**Third**, the Response (at PageID.163) cites five cases for Plaintiffs' "privacy injury" theory of standing. Plaintiffs make no attempt to analogize these cases to the allegations in the Amended Complaint, and none can save their case from dismissal under Rule 12(b)(1), as they are non-controlling and distinguishable. *See Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 286 (2d Cir. 2023) (plaintiff whose social security number was stolen pled Article III injury by alleging that she spent time and money to prevent, detect, and recover from identity theft); *Allen v. Wenco Mgmt., LLC*, 696 F. Supp. 3d 432, 437 (N.D. Ohio 2023) (stating that "jurisdictions are split on" whether "privacy injury" is cognizable under Article III, but finding that a plaintiff whose name, social security number, and health-insurance information was stolen in a data breach—and who had "spent extensive time handling the fallout of this data breach"—alleged cognizable injury); *Savidge v. Pharm-Save, Inc*., 727 F. Supp. 3d 661, 692 (W.D. Ky. 2024) (where defendants turned over plaintiffs' W-2s and social security numbers to cybercriminals, plaintiffs had alleged injury through "the exposure of [] private and highly sensitive PII to unauthorized third parties"); *A.B. v. Google LLC*, 737 F. Supp. 3d 869, 875 (N.D. Cal. 2024) (discussing "split of authority" and "no binding Ninth Circuit precedent" on whether "the loss of personal information through [a defendant's] data collection [is] sufficient to qualify as the diminution of a future property interest" in such information, and thereby support Article III standing). In sum, these cases do not bind this court, and do not involve facts similar to those alleged here (*i.e.*, basic contact information that Plaintiffs themselves disclosed, no alleged identity theft, and no alleged disclosure to unauthorized third parties).

Plaintiffs conclude this paragraph with a case from the Third Circuit which simply states, "In the data breach context, there are several potential parallels to harms traditionally recognized at common law, depending on the precise theory of injury the plaintiff puts forward." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 154-55 (3d Cir. 2022). This is fair enough, but it has no particular relevance to Plaintiffs' allegations here.

**Fourth**, Plaintiffs cite a string of out-of-circuit district court cases for the proposition that their names, mailing and email addresses, and phone numbers are "irrefutably valuable." Resp. at PageID.164. It is not clear whether this theory of injury is distinct from Plaintiffs' alleged "privacy injury." Regardless, these cases—at most—hold that a plaintiff who pleads and proves that the value of their information has actually decreased due to a defendant's unauthorized disclosure thereof might, under certain circumstances, suffer Article III injury. *See In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1203-1204 (S.D. Fla. 2022) (holding that "a plaintiff could base injuries in fact on actions related to the mitigation of future harms" where they "allege a substantial and imminent risk of future identity theft," but not "if the risk of harm to plaintiffs is not substantial."); *Rodriguez v. Mena Hospital Comm'n*, No. 2:23-cv-2002, 2023 WL 7198441 (W.D. Ark. Nov. 01, 2023) (generally "recognizing the lost property value of personal information," but noting "some cases" outside that district "where courts have granted motions to dismiss" similar allegations); *In re Yahoo! Inc. Customer Sec. Data Breach Litig.*, No. 16-2752, 2017 U.S. Dist. LEXIS 140212, 2017 WL 3727318, at *14 (N.D. Cal. Aug. 30, 2017) (finding standing based on risk of future identity theft and diminished value of plaintiffs' information).

As to diminution of value in particular, "[m]ost courts considering this type of 'injury' have concluded that it is not compensable, at least in the absence of plausible allegations that the plaintiffs have lost the ability to sell their information on the black market or that their ability to

5

participate in the marketplace has been impaired." *In re Numotion Data Incident Litig.*, No. 3:24-CV-00545, 2025 WL 57712, at *15 (M.D. Tenn. Jan. 9, 2025) (collecting cases). This is the prevailing approach in Michigan federal courts. *See, e.g.*, *Lochridge v. Quality Temp. Servs., Inc.*, No. 22-CV-12086, 2023 WL 4303577, at *4, n.2 (E.D. Mich. June 30, 2023) (noting that courts that have found Article III injury on a diminution-of-value theory have required "allegations that the plaintiffs attempted to sell their personal information or [that a] data breach forced them to accept a decreased price for that information;" concluding that, where a "[p]laintiff does not allege any specific facts showing he planned to sell his information, just that it must have decreased in value . . . the court does not find that this suffices as an independent injury in fact sufficient to confer standing.") (citations omitted). Other courts in the Sixth Circuit take a similar approach. *See, e.g.*, *Doe v. Mission Essential Grp., LLC*, No. 2:23-CV-3365, 2024 WL 3877530, at *7 (S.D. Ohio Aug. 20, 2024) (rejecting diminution-of-value theory of injury where "Plaintiff does not allege that he ever tried to derive any value from his PII."), *appeal dismissed,* No. 24-3815, 2024 WL 5165129 (6th Cir. Dec. 2, 2024).

Plaintiffs have not alleged that their names, email addresses, mailing addresses, and telephone numbers have in fact diminished in value as a result of any action by Defendants. Nor do they claim to have ever "tried to derive any value" from this basic contact information. Thus, they have not alleged Article III injury on a "diminution-of-value" theory, even if such injury were cognizable. *Cf., e.g.*, *id.*; *Lochridge*, 2023 WL 4303577, at *4, n.2.

**Fifth**, Plaintiffs try to distinguish the authorities in the MTD Brief (at PageID.85-91) on the theory that the plaintiffs in those cases did not "allege that their private or personal information had been divulged in any way, or that they had suffered any consequences such as loss of privacy in their personal information." Resp. at PageID.165. ***Neither have the Plaintiffs before this Court,***

6

and the Response identifies nothing in the Amended Complaint to suggest otherwise. Instead, it simply repeats the threadbare allegation: "Plaintiffs maintain that they have suffered actual and ongoing privacy harm in the loss of their private information." Resp. at PageID.165. This cannot survive a motion to dismiss. *E.g.*, *Mackinac Ctr. for Pub. Pol'y*, 102 F.4th at 351.

Nor do Plaintiffs save their standing by arguing that "they have alleged imminent harm in the misuse of their personal information because Defendants did not obtain the information for the stated purpose of the random million-dollar lottery," Resp. at PageID.165 (citing Am. Compl. ¶¶ 23-24, 26, 71-72). In fact, Plaintiffs do not allege any specific use of their information—authorized or unauthorized; past, present, or imminent—by Defendants or anyone else. Rather, the cited paragraphs simply (1) state that Plaintiffs signed the petition (¶¶ 23, 24); (2) falsely quote counsel's statements to a Philadelphia judge who rejected the theory that Defendants' petition program was a "lottery" (¶ 26);[2] and (3) vaguely allude to America PAC's political purpose (¶¶ 71, 72).

Specifically, Paragraph 71 says that Plaintiffs' "signatures on the petition were used to inflate the numerical support for Musk and PAC's political views, support for the Republican candidate for President and other conservative themes and views." Am. Compl. ¶ 71. This does not allege the *actual use* of Plaintiffs' contact information for *any discrete act whatsoever*. *How* did Defendants use Plaintiffs' names, email and mailing addresses, and phone numbers to "inflate numerical support" for Musk, a Presidential candidate, or unspecified "conservative themes and views"? We are never told. Similarly, Paragraph 72 claims that Plaintiffs were "exploited by Musk

---

[2] The Response (at PageID.28) characterizes defense counsel's arguments in Philadelphia state court as "confirm[ing] that the awarding of the $1 million dollars was not 'random' or by 'chance.'" This is wrong. The Amended Complaint admits that counsel instead stated, "You will hear testimony today clarifying that while recipients *were selected without a preset plan, which is the very definition of randomly*, they were not chosen by chance." Am Compl. ¶ 28(c) (PageID.29) (emphasis added).

7

and the PAC to further their political support of the Republican candidate for President and to obtain Plaintiffs' and the Class's valuable personal information." Am. Compl. ¶ 72 (PageID.43). Again, at most, Plaintiffs complain that *they* provided their information. They do not identify any specific action that Defendants took using that information.[3] Even if it were proper to "infer" some particular action (it is not), Plaintiffs do not claim they were unaware of how their information might be used when they signed the petition, nor do they provide any basis to conclude that the information was utilized in any illegal or unauthorized manner. *See* MTD Brief at PageID.80-82 (describing information collected on the petition, America PAC's disclosures and privacy policy, and the use of information on the petition to select people who were offered the opportunity to earn $1 million as a paid spokesperson).

**Sixth**, Plaintiffs' argument to continue this case against Messrs. Gober and Young fails because it is based wholly upon their oft-asserted legal conclusion of "fraud," and mischaracterizations of statements at the Philadelphia hearing. Resp. at PageID.165-166. The Response cites no relevant legal authority on this point, nor does it address any of the reasons why Plaintiffs lack standing as to these individual-capacity Defendants. *See* Resp. at PageID.91-93 (explaining, *inter alia*, failure to allege injury caused by or redressable through Gober or Young). Plaintiffs' failure to allege injury defeats this case as to all Defendants. But even if the Court were to conclude otherwise, there is no arguable basis to continue this case against Gober and Young.

---

[3] Despite Plaintiffs' claim otherwise, the Court may consider the America PAC website's privacy policy in the context of Plaintiffs' allegations of "privacy injury." *See Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (at motion to dismiss stage, court may consider documents and items referenced in complaint); *see also* Am. Compl. ¶ 1, 49 (PageID.24, 38) (relying on and linking to America PAC website).

**II.   The Response clarifies the allegedly "fraudulent" statement at issue in an effort to satisfy Rule 9(b).**

Plaintiffs do not dispute that Rule 9(b) applies, and that—to satisfy it—Plaintiffs "must specify the statements that the plaintiff contends were fraudulent." Resp. at PageID.167 (cleaned up). In addressing Defendants' Rule 9(B) argument, Plaintiffs do not directly "specify" any purportedly fraudulent statement, but they do cite several paragraphs of the Amended Complaint. Resp. at PageID.167 (citing Am. Compl. ¶¶ 15, 17-19, 68, 75). Only one of those paragraphs—18—"specifies" any particular statement by any Defendant. Paragraph 18 quotes Musk at the October 19, 2024 America PAC town hall, stating, "We really want to get as many people as possible to sign this petition, so I have a surprise for you. And it's that we'll be awarding $1 million dollars, randomly, to people who have signed the petition. Every day from now until the election." Am. Compl. ¶ 18 (PageID.27). As explained in greater detail *infra*, III, Plaintiffs' clarification of the allegedly fraudulent statement upon which this case is predicated further emphasizes the conclusion that these claims fail under Rule 12(b)(6).

**III.   The Response does not cure Plaintiffs' failure to state a plausible claim.**

   **a.   Fraudulent Inducement**

Plaintiffs' Response alludes to a "fraudulent inducement" claim, but it does so only in discussing Article III injury, *not* in arguing against Rule 12(b)(6) dismissal. *Compare* Resp. at PageID.162-165 *with id.* at PageID.169-172. Even if the Amended Complaint asserted fraudulent inducement (it doesn't—Plaintiffs dropped this claim when they amended), and even if Plaintiffs had Article III standing (they don't), the fraudulent inducement claim fails under Rule 12(b)(6) because the facts alleged don't support its essential elements.

Under Michigan law, the elements of fraudulent inducement are:

9

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that is [*sic*] was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 276 Mich. App. 146, 161, 742 N.W.2d 409, 420 (2007) (quotation omitted); *see also Encana Oil & Gas, Inc. v. Zaremba Fam. Farms, Inc.*, No. 1:12-CV-369, 2013 WL 12177022, at *11 (W.D. Mich. Dec. 3, 2013) (same).[4]

Plaintiffs' fraudulent inducement claim fails for at least three reasons. **First**, they have not pled element 6 because they haven't pled actual injury, *i.e.*, damages. *See, e.g.*, MTD Brief at PageID.85-91; *supra,* I. **Second**, the pleadings foreclose the conclusion that Defendants represented their program as a "lottery," which defeats Plaintiffs' fraudulent misrepresentation theory. **Third,** Plaintiffs articulated a fraudulent inducement claim in their Original Complaint but intentionally dropped it from their Amended Complaint. They cannot revive this claim in an effort to avoid dismissal.

Indeed, the Response emphasizes that Musk's October 19 statement at an America PAC town hall is the basis of Plaintiffs' allegations of fraud. *Supra*, II. The Amended Complaint relies upon a news article discussing that October 19 statement. MTD Brief at PageID.81. And that news article quotes Musk as saying—during the allegedly fraudulent October 19 statement—"The only thing we ask ***for the million dollars*** is that ***you be a spokesperson*** for the petition." *Id.* Thus, Plaintiffs' source material for the allegedly fraudulent statement that Defendants were operating a

---

[4] While fraudulent inducement theory springs from tort, it's typically based on representations made to induce the plaintiff to sign a contract. *See Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 371-72, 532 N.W.2d 541 (Mich. Ct. App. 1995)). So it's unclear how a "fraudulent inducement" theory even applies here, since Plaintiffs do not claim to have contracted with any Defendant, and Plaintiffs abandoned the breach of contract claim pled in their Original Complaint (PageID.11-12).

"lottery" ***affirmatively dispels*** the notion that there was any "chance" to win a "prize." *See also, e.g.*, *infra* at 13 (elements of lottery are chance, prize, and consideration); MTD Brief at PageID.82-83 (as a matter of law, $1 million opportunities were not a "prize" and were not determined by "chance"). Rather, it describes an opportunity to earn as a paid spokesperson for the PAC, which Musk plainly stated in announcing the very first $1 million spokesperson.[5]

It is axiomatic that "[t]here can be no fraud where a person has the means to determine that a representation is not true." *Nieves v. Bell Indus., Inc.*, 204 Mich. App. 459, 464, 517 N.W.2d 235 (1994). Thus, "a claim of fraud fails if 'the allegedly defrauded party was given direct information refuting the [alleged] misrepresentations.'" *Smith Living Tr. v. Erickson Ret. Cmtys.*, 326 Mich. App. 366, 391, 928 N.W.2d 227, 242 (2018) (citation omitted). Here, Plaintiffs don't state a fraudulent inducement claim because the allegedly actionable statement contained direct information refuting the perception that the spokesperson program was a "lottery."

Moreover, Plaintiffs' Original Complaint articulated a fraudulent inducement theory of liability. ECF No. 1 ¶¶ 41-57 (Page.ID 9-11). While captioned "fraudulent misrepresentation," this claim is based on the theory that alleged "false and misleading representations" regarding the $1 million spokesperson program "w[ere] meant to induce and entice registered voters in [eligible] states to sign the petition." *Id.* ¶¶ 47-49 (PageID.10); *see also id.* ¶ 1 (PageID.1) (claiming that

---

[5] Although Plaintiffs' own source refutes it, the Amended Complaint alleges that "The only conditions and/or requirements [for the $1 million opportunities] made known publicly were that individuals: a. Be registered voters; b. Reside in one of the battleground states; c. Support the First and Second Amendments; and d. Sign the petition." Am. Compl. ¶ 19 (PageID.27). This raises question about compliance with Federal Rule of Civil Procedure 11(b)(3), which provides that, "[b]y presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*, the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3) (emphasis added).

Musk and the PAC "fraudulently induced Alvarez" to sign petition). This claim appears nowhere in the live pleading. *See* Am. Compl. Since an amended complaint supersedes an original complaint, Plaintiffs cannot use their abandoned fraudulent inducement theory to overcome a motion to dismiss. *See, e.g.*, *Drake v. City of Detroit*, 266 F. App'x 444, 448 (6th Cir. 2008) (a prior "complaint is a nullity, because an amended complaint supersedes all prior complaints," and that, consequently, "any defects in [a] First Amended Complaint cannot be repaired by prior complaints.") (citation omitted). Because Plaintiffs' live pleading abandoned their fraudulent inducement theory, it cannot form a basis to overcome dismissal here.

      b.    **Silent Fraud**

Plaintiffs' silent fraud theory is that Defendants "suppressed the true nature" of the $1 million spokesperson opportunities: specifically, that Defendants' factual representations about the spokesperson program falsely described it as a "lottery" or "sweepstakes." *E.g.*, Resp. at PageID.169.

As the MTD Brief (at PageID.91-93) explains, Plaintiffs do not state a silent fraud claim because such claim requires a legal duty to disclose, and Plaintiffs plead no facts giving rise to any such duty here. Plaintiffs unsuccessfully attempt to overcome this by citing three cases. First, they cite *Deschane v. Klug*, 344 Mich. App. 744, 751 (2022) for the general (and undisputed) proposition that Michigan courts recognize silent fraud as a legal claim. Resp. at PageID.169. Then, they cite *Clemens v. ExecuPharm, Inc.*, 678 F. Supp. 3d 629, 636 (E.D. Pa. 2023) and *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017) for the proposition that entities that collect and store "sensitive, private data" have a duty to protect that information. Resp. at Page.ID.170. The Amended Complaint does not accuse Defendants of a failure to adequately "safeguard" Plaintiffs' contact information from unauthorized access (and

12

the extent that basic contact information is properly be characterized as "sensitive" and "private" is debatable, at best). Plaintiffs' authorities are irrelevant.

Next, Plaintiffs point out that lotteries—*i.e.*, games of chance, prize, and consideration—violate Michigan law. Resp. at PageID.170-171 (citations omitted). It is unclear what relevance Plaintiffs assign to this proposition in the context of their silent fraud claim, as they do not attempt to tie it to any element thereof. If anything, this further undermines the notion that there was any material misrepresentation here: that lotteries are illegal in Michigan provided yet *another* indication to Plaintiffs that Defendants were not, in fact, operating a lottery through the paid spokesperson program, and that they did not "suppress" this purportedly "material fact." *See, e.g.*, MTD Brief at PageID.97-99 (discussing failure to allege elements of silent fraud).

Finally, the Response (at PageID.171) posits that "[w]hether Defendants had a legal duty to truthfully disclose the terms of the alleged 'random' lottery when collecting Plaintiffs' . . . information is perhaps an issue of fact not appropriate for testing upon the initial pleadings." The existence of a legal duty is, of course, a question of *law*. At the 12(b)(6) stage, the inquiry is whether the undisputed contents of Musk's allegedly actionable statement—as a *legal* matter—describe a "lottery," or otherwise give rise to any unmet legal duty of disclosure. *See, e.g.*, *Mackinac Ctr. for Pub. Pol'y*, 102 F.4th at 351 ("we need not accept the complaint's legal conclusions as true."); MTD Brief at PageID.97-99. Because the Amended Complaint does not allege facts that support such a conclusion, Plaintiffs' silent fraud claim fails.

\*   \*   \*

The Response's conclusion (at PageID.172) offhandedly requests leave to amend the live pleading "[i]f the Court is inclined to grant any part of Defendants' Motion." But "[a] request for a court order must be made by motion," and said motion must "state with particularity the grounds

for" the relief sought. Fed. R. Civ. P. 7(b)(1)(A)-(C). *See also* W.D. Mich. LCivR 5.7(f) (requiring proposed amended pleading to be attached to motion for leave). Granting such a request where the Plaintiff has not moved for leave to amend would be procedurally improper. Even if Plaintiff filed such a motion, it would be substantively improper and should be denied for futility, for the reasons in the MTD Brief and those here. *E.g.*, *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 355 (6th Cir. 2014) (courts need not give leave to amend when doing so would be futile).

## CONCLUSION

For the foregoing reasons and those in Defendants' Motion to Dismiss and Brief in Support, this case should be dismissed in its entirety.

Dated: March 14, 2025                    Respectfully submitted,

*/s/ Robert L. Avers*
Charles R. Spies (P83260*)*
Robert L. Avers (P75396)
Daniel C. Ziegler (P86312)
Dickinson Wright PLLC
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
(734) 623-1672
cspies@dickinsonwright.com
ravers@dickinsonwright.com
dziegler@dickinsonwright.com

*/s/ Andy Taylor*
Andy Taylor (TX19727600)
ANDY TAYLOR & ASSOCIATES, P.C.
2668 Highway 36S, #288
Brenham, Texas  77833
713-412-4025 (mobile)
ataylor@andytaylorlaw.com

*Counsel for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the word limitation of W.D. Mich. LCivR 7.2(b)(i). The brief contains 4,244 words, excluding the parts of the brief exempted by W.D. Mich. LCivR 7.2(b)(i). The word count was generated using Microsoft Word 2016.

Dated: March 14, 2025                              */s/ Robert L. Avers*
                                                                         Robert L. Avers (P75396)